IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
January 7, 2026 Session

**HEATH BELL v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
**No. 13-01286          Paula L. Skahan, Judge**

_____

**No. W2025-00149-CCA-R3-PC**

_____

The Petitioner appeals from the order of the post-conviction court denying his petition seeking relief from his conviction for first-degree murder. In this appeal, the Petitioner argues (1) that trial and appellate counsel provided ineffective assistance of counsel in failing to object to or raise as an issue on appeal the admissibility Chamere Talley's prior statement based on Tennessee Rule 803(26); (2) that the State and the trial court violated due process in failing to conduct a hearing pursuant to Rule 803(26); (3) that trial counsel was ineffective in failing to conduct an adequate closing argument; and (4) that the cumulative effect of trial counsel's errors deprived the Petitioner of a fair trial.[1] We affirm.

**Tenn R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which J. ROSS DYER, and MATTHEW J. WILSON, JJ., joined.

Josie S. Holland, Memphis, Tennessee, for the appellant, Heath Bell.

Jonathan Skrmetti, Attorney General and Reporter; G. Kirby May, Assistant Attorney General; Steven J. Mulroy, District Attorney General; and Leslie Byrd, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The facts giving rise to the Petitioner's convictions, as set forth in this Court's direct appeal, provide that on the night of February 15, 2013, the victim, Joe Howell, was shot to death in his newly leased Hyundai Trailblazer in the parking lot of the Pendleton Place Apartments in Memphis. State v. Bell, No. W2016-00136-CCA-R3-CD, 2017 WL

---

[1] We have combined issues one and three from the Petitioner's brief as they appear to be based on the same legal argument except issue one challenges the ineffectiveness of trial counsel and issue three challenges the ineffectiveness of appellate counsel.

1907739, at *1 (Tenn. Crim. App. May 9, 2017) perm. app. denied (Tenn. Sept. 22, 2017). Fifteen hundred dollars in cash, which the victim earlier had on his person, was missing when his body was discovered in his vehicle. Although there were no eyewitnesses to the crime, Kayla Jennings and her boyfriend, James Edwards, identified the Petitioner and his co-defendant, Nicholas Augustus, as two men with guns they had seen acting in a suspicious manner in the area shortly before the shooting. Ballistics evidence revealed that two different guns were fired at the victim and that shots entered from both the driver's and the passenger's side of the vehicle. Although the Petitioner claimed to have been with his girlfriend in East Memphis at the time, cell phone records revealed that phone calls were made and received by his cell phone in the area of the shooting around the time the victim was shot. Based on these facts, the Petitioner was convicted of first-degree premeditated murder and first-degree felony murder, for which he received an effective sentence of life imprisonment. Bell, 2017 WL 1907739 at *1.

As relevant to the issues raised in this appeal, the proof at the Petitioner's trial established the following:

Chamere Talley testified that she knew the [Petitioner], who was one of her neighbors at the Pendleton Place Apartments, by the nickname "Bing." She had also seen the co-defendant, Mr. Augustus, who lived "down the walk," but she did not know him. She testified she did not know who was responsible for the victim's death, had not seen anyone around the area on the night he was killed, and did not see the [Petitioner] that day. She acknowledged, however, that she signed a February 18, 2013 statement to the police in which she said that she had seen the [Petitioner] and a second man in dreadlocks running from the direction of the victim's rolling vehicle immediately after she heard gunshots. She insisted that the statement was coerced and fabricated by the police, who, she claimed, kept her handcuffed to a chair for three or four hours, cursed her, and threatened to charge her with murder and remove her three children from her custody.

The witness testified that she made up the descriptions she provided to the police of the perpetrators. She stated that she and the [Petitioner] had never been romantically involved and she had no idea how the police came up with the portion of her statement in which she allegedly said they had been dating. She testified she made up the portion of her statement about the [Petitioner's] having talked about his "Ruger." Later in her direct examination testimony, however, she claimed that the police fabricated that portion of the statement. She said the portion of her statement was true in which she said she heard approximately eight gunshots about ten or fifteen minutes after her sister arrived at her apartment and told her that she had just

- 2 -

been dropped off by the victim, who had gone around the corner to "serve someone."

On cross-examination, the witness testified that she had also repudiated the statement at the preliminary hearing, held only a few weeks after she signed her statement. She said on the day of her statement, the police arrested her at her workplace, placed her in handcuffs, brought her to an interview room, handcuffed her to the table, and interrogated her for hours, calling her a "f***ing liar" when she denied any knowledge of the crime. According to her testimony, it was only after the officers threatened to take her children from her and charge her with first degree murder that she signed the statement.

On redirect examination, the witness denied that she was afraid she would be charged with murder because she knew she had informed the [Petitioner] in a telephone call on the day of the victim's murder that the victim had money on him. On recross-examination, she agreed that there was nothing in her statement to police about her having informed the [Petitioner] that the victim was carrying cash.

. . . .

Detective Frias [of the Memphis Police Department's Homicide Bureau] testified that he and Sergeant Brown interviewed Chamere Talley on February 18, 2013, which resulted in her signed statement. He said she did not appear to be under the influence of alcohol or narcotics, exhibited no difficulty in reading her advice of rights form, and initialed and signed the advice of rights form and her statement. The interview took place at the homicide office. She was not in custody at the time the interview began but was handcuffed and taken into custody when it became clear that she had lied about her contacts with the [Petitioner]. Detective Frias explained that "discrepancies" in a prior interview with other investigators led to the February 18 interview, during which he asked if there was anything in her telephone that could be considered evidence in the murder investigation. She answered "No, no, here," handing him her phone. As he was looking through it, he asked if she knew the [Petitioner], and she replied that she did not. He then asked her why the [Petitioner's] phone number was in her phone. In response, she broke down crying, repeatedly said that she did not want to die, and expressed fear for the safety of herself and her children. Detective Frias said it was at that point that he had her "shackled" by handcuffing one of her ankles to the chair in which she was sitting.

Detective Frias testified that he read Ms. Chamere Talley the advice of rights form and that she signed it at 3:59 p.m. She signed her completed statement at 6:52 p.m. In the interim between the signed waiver of rights and the signed statement, officers gave her water, let her calm down, dealt with other matters, and returned periodically to the interview room, where she provided pieces of information that they verified before continuing with the interview. She never asked for a lawyer. Detective Frias acknowledged that he and Sergeant Brown may have screamed obscenities at her during the interview process because she was, in their opinion, being untruthful. He denied that he threatened to lock up Ms. Talley for first degree murder or to take her children from her. Detective Frias did, however, tell her that she could be locked up for giving a false statement to a police officer and could be charged with murder if they discovered "that she had any involvement in [the] murder[.]" He also asked her who would care for her children if she went to jail.

Detective Frias read Ms. Chamere Talley's statement aloud, in which she identified the [Petitioner] as the man she had been dating for two months and whom she saw running near the victim's vehicle immediately after she heard gunshots. Detective Frias said that the words in the statement were entirely Ms. Talley's and that no one told her what to say. The portion of the statement in which she was asked to describe what occurred reads as follows:

> My sister knocked on the door around 10:15, and I opened it to let her in, and I asked her how did she get to my house. She said [the victim] dropped her off, and he was going around the corner to serve someone. About ten to fifteen minutes passed, and I started to hear gunshots. It was about eight in all.

> My mother and my nine-year-old son and my nephew and my sister were in the house. My sister started putting everybody on the floor, and I went to the door to look. The shooting was over, and I looked out the door, and I saw [the Petitioner] and another dude running [from] the direction of ... a gray truck past the dumpster. I recognized [the Petitioner] from the side of his face and the cap he had on because I saw him with that cap on before.

- 4 -

I didn't know, but later on, I found out that that was [the victim's] truck—that that was [the victim] in the truck.

Detective Frias testified that during a February 25, 2013 interview with the [Petitioner], the [Petitioner] denied any involvement in the murder and claimed to have been at his girlfriend's East Memphis apartment at the time. The [Petitioner] also denied talking to [the codefendant] on the phone that day, either before or after the shooting. [The codefendant] informed Detective Frias during a February 26, 2013 interview that he had heard the gunshots and run to see what was happening and that his fingerprints would be found on the victim's vehicle because he had touched the driver's door. In response to a juror question, Detective Frias testified that he understood Ms. Chamere Talley's expression that the victim was going to "serve someone" to mean that the victim was going to make a drug sale.

On cross-examination, Detective Frias testified that when it became clear to him that Ms. Chamere Talley was lying during her interview, he raised his voice to her and said, "I can't believe you're going to sit here and lie for this mother f*****." He acknowledged that she described the second suspect as having dreadlocks and that [the codefendant] did not have dreadlocks when he interviewed him on February 26, 2013.

Bell, 2017 WL 1907739, at *4-6.

Following his convictions and sentence, the Petitioner filed a motion for new trial, arguing, in pertinent part, that the trial court erred in allowing the testimony of Chamere Talley in violation of Tennessee Rules 617 and 803(26) and that the trial court "unreasonably limited" trial counsel's closing argument. In rejecting these issues, the trial court stated, in relevant part, as follows:

[Trial counsel] has also included the statement of Chamere Talley . . . and for the record, this is the statement that all parties asked that the statement in its entirety be submitted to the jury. I talked to all parties about maybe redacting some things, taking out some things, and [trial counsel, and codefendant's counsel], were all of the opinion that we want the jury to see the whole statement, we don't want anything redacted, we want the whole statement to be submitted to the jury.

[Trial counsel] is now saying that perhaps part of that was in error, and we will address that as we get to that part in the motion, but that statement

- 5 -

of Chamere Talley was, in fact, admitted into evidence, was published into evidence.

[The prosecutor], I believe, was asking Ms. Talley questions about certain parts of her statement that were true, certain parts that were not true. There were a lot of things that Ms. Talley told the jury was, in fact, true. A lot of her statement she did not have any objections to, did not have any issues with, and told the jury, substantially, a lot of things that were reflected in that statement were absolutely true.

What Ms. Talley had problems with were those parts of the statement which were exculpatory. This was admitted as Exhibit No. 51, and those things that were, in fact, exculpatory, such as, "Do you know who is responsible for the death of Joe Howell," and she says, "Yes, I think it's a guy named Bean. Saw him running after shots were fired, him and another person I don't know. They were the only people I saw outside running from the direction of the truck as it was rolling away."

Asked about what Bean had on, which was consistent with clothing definition that was given by other witness. Asked her to describe Bean, which she did. Told the police that she had been dating him for about two months. Was shown a photograph, and she identified Bean as the person she had been dating for two months.

And she tried to retract that, and part of that, said she did not tell the police that she been dating him, did not tell the police that she had seen him running away from this killing. But she gave a four-page statement that was admitted as Exhibit 51 in the trial of this case, and there were no objections made to the admission of that exhibit, and all lawyers . . . said, "we want the whole statement in because this is largely exculpatory, and we do not object to the admission of this statement."

. . . .

[The Petitioner's] girlfriend, Chamere Talley, put him there with a gun running away from a shooting as the truck was still moving, and this jury accredited the statement that she gave -- had given the police and did not believe her contradictory statements that she gave in front of the jury.

And, even though she's been trying to recant those statements forever, and it is not anything that one should not expect, when she has a statement

- 6 -

and comes to Court and she has a relationship with [the Petitioner], and she's now trying to distance herself from those statements. It is not atypical to believe that Ms. Talley would come to Court and say, "I lied to the police, and those things are not true, and I'm now telling the truth at a prelim, and I'm telling the truth at Court."

And this Court again, for the record, as the thirteenth juror, or affirms the verdict in this case, and even though it is a circumstantial case, this court is of the opinion that there is more than enough evidence -- two witnesses that put [the Petitioner] in possession of a gun looking as if he's getting ready to do something, getting ready to rob someone, and the person that knows him, has dated him - and, whether it's for two weeks or two months, because she's given inconsistent answers -- saw this [Petitioner] running away from a killing as the car was still moving.

And under 803(26), prior inconsistent statements of a testifying witness are, in fact, admissible, under 613(b), if certain things are established or satisfied. She must testify at trial, and she was, in fact, testifying at trial, was subject to cross[-]examination, did give a written statement in which she was given -- was allowed to explain some things that she said were true, some things that she said were not true.

And the Court has to make a determination as to whether or not the statement was made under circumstances indicating that it is otherwise trustworthy, and the Court did find that the statement was trustworthy. [Ms. Talley] will tell the Court that she was threatened, she was forced, to give that statement, but I do not believe that her statements regarding how that statement was given was, in fact, a truthful statement.

And under 613(b), extrinsic proof of those prior inconsistent statements are, in fact, admissible if a witness is given an opportunity to review the statement, and if the witness continues to deny or contradict or say, "I don't remember," then extrinsic proof is, in fact, admissible, and under 803(26), it becomes, in fact, not hearsay, and it becomes evidence that the jury, in fact, can consider those prior inconsistent statements.

And again, for the record, all lawyers . . . all said, "Not only do we want part of the statement in" -- the State wanted to introduce the inconsistent part of the statement, but the lawyers said they wanted the whole statement because this statement actually helps [the Petitioner and codefendant] more

- 7 -

than it hurts, and so the whole statement was introduced because the lawyers, in fact, wanted that whole statement in.

And this Court charged the jury, on page 19 of the jury charge, correctly charged the jury, under "Impeaching a witness," that, "However, unless entered as a numbered exhibit by the Court and allowed to be taken by you back to the jury room when you deliberate, proof of any prior inconsistent statements may not be considered -- may be, rather, considered by you only for the purpose of determining whether the witness is telling the truth at trial. The contents are not to be considered as proof in the trial."

And 803(26) was amended, was passed by our legislature and affirmed by the Supreme Court, that indicates if you have a prior inconsistent statement that has been admitted, if it is admitted by the court, numbered as an exhibit and allowed to be taken to you to the jury room while you are deliberating, you may, in fact, consider that as substantive evidence.

In regard to trial counsel's closing argument, the trial court continued and found

Tennessee Rules of Criminal Procedure 29.1 -- when it comes to closing arguments, 29.1 Subsection D, the Court's discretion to control closing arguments and that the Court has discretion to set the number of closing arguments permitted on behalf of the State, depicted the number of closing arguments permitted to each defendant, and to control the order and length of closing arguments. The Court shall allow adequate, but not excessive, time for closing arguments to make a full presentation of the theory of the case. That's what the Court did in this under 29.1.

. . . .

The State of Tennessee collectively, all their arguments on this case, consumed roughly fifty minutes, and that's for both Defendants. Not for each Defendant, but for both Defendants.

[Codefendant's counsel's] argument took about fifty minutes, and [trial counsel's] argument was about an hour. And this Court, under 29.1, indicated to [trial counsel] "[Trial counsel], you need to wrap this up," because he had been arguing for an hour, longer than the collective arguments of the State and longer than [co-counsel's] arguments. [Codefendant] was acquitted on the basis of the arguments that were made.

- 8 -

. . . .

But this is one of those cases in which a juror made a gratuitous statement that I will put on the record so it will not be an ex parte communication, in which the juror said, "Judge Coffee," basically, "those arguments were too long, and we're glad that you stepped in at some point and said, 'we need to bring these arguments to a conclusion,' because they were too long, and we did not understand, did not know how much longer we could have actually sat there."

I have to take into consideration whether or not the process, the trial process, is causing discomfort to jurors. These folks had been here all week. These arguments started on Saturday morning, and [trial counsel] indicates he had some other things he would have covered in his argument had he been given additional time, but this Court has the authority and has the discretion to impose reasonable limits, and this Court has an obligation to make sure lawyers are given adequate but not excessive time to argue cases, and I find firmly that one hour to argue a case is, in fact, more than adequate.

. . . .

A lot of [the grounds in trial counsel's motion] says, "I would have argued some other things about the law if I had been given other time," but the Court has to charge the jury, and this Court did, in fact, charge jury on this case, and the Court correctly charged on this case.

The Petitioner appealed his judgments and raised the following five issues for review: (1) whether the trial court erred by denying his motion to suppress tainted eyewitness identification testimony; (2) whether his due process rights were violated by the State's withholding of exculpatory evidence of a possible third party perpetrator; (3) whether the trial court erred by not granting his request for a new trial based on the newly discovered exculpatory evidence; (4) whether the evidence was sufficient to establish his identity as one of the perpetrators; and (5) whether the trial court erred by limiting his closing argument. Bell, 2017 WL 1907739 at * 1. Upon review of the record, this court relied on the extensive findings by the trial court in denying the motion for new trial and found no abuse of discretion in the trial court having limited trial counsel's closing argument to a reasonable length of time. Id. at *13.

On September 19, 2018, the Petitioner filed a pro se petition seeking post-conviction relief from his judgments alleging ineffective assistance of counsel based on trial counsel's

failure to provide an adequate closing argument. Within a month, the post-conviction court appointed counsel and issued an order for the State to respond. On April 26, 2019, the State filed its response and denied the allegations in the Petitioner's pro se filing. On June 17, 2020, appointed counsel filed an amended petition on the Petitioner's behalf alleging, in pertinent part, that trial counsel was ineffective in failing to give a proper closing argument. On September 28, 2020, another law firm filed a notice of appearance.[2] On June 30, 2022, an order was entered allowing appointed counsel to withdraw and authorizing post-conviction counsel to substitute as counsel of record. On August 16, 2022, post-conviction counsel filed a second amended petition for post-conviction relief incorporating the prior petition and, alleging, in pertinent part, (1) that trial counsel was ineffective in failing to object to the testimony of Chamere Talley; (2) that trial counsel was ineffective in failing to object to the State calling Chamere Talley as a witness for the sole purpose of impeaching her and using her prior inconsistent statement as substantive evidence under Rules 607 and 803(26) of the Tennessee Rules of Evidence; and (3) that appellate counsel was ineffective in failing to raise the same issue under plain error review in the Petitioner's direct appeal.

On September 27, 2024, the post-conviction court conducted an evidentiary hearing. Post-conviction counsel announced that the parties had entered into a joint stipulation to the admissibility of the trial record and the preliminary hearing transcript.

The Petitioner testified that he had retained trial counsel for the purpose of representing him at trial and that appellate counsel was appointed to represent him on appeal. The Petitioner said that trial counsel did not discuss the preliminary hearing with the Petitioner because another attorney had handled the preliminary hearing for the Petitioner. The Petitioner believed that trial counsel had discussed the matter with preliminary hearing counsel. The Petitioner agreed that there was a finding of no probable cause at the preliminary hearing. The Petitioner recalled that the day after the preliminary hearing, he was indicted by the grand jury and arrested shortly thereafter.

The Petitioner was also aggrieved because during trial counsel's closing argument, trial counsel "got to talking about some movies and stuff" and the judge told him to end his argument before trial counsel was able to make his "main" argument. Post-conviction counsel then read from trial counsel's motion for new trial which claimed that had trial counsel been allowed to continue, he would have spoken to the jury about the following subjects:

---

[2] This law firm was counsel for the Petitioner's co-defendant, who was acquitted at trial. The record reflects that after a hearing, the trial court denied this firm's motion to represent the Petitioner.

admission against interest, defendants weren't given an opportunity to sign any statements; two, identity, identity must have been shown beyond a reasonable doubt; three, burden of proof; on Page118: four, impeaching, even if prior statement of Chamere Talley is to be true, she did not see any shooting. All she saw was [the Petitioner] running from the direction of the truck and he was unarmed. [Trial counsel] would have given other reasons why [the Petitioner] was running from the truck when he saw and heard the shots being fired; five, credibility, did any witnesses have motive to lie or exaggerate what they saw; six, expert witnesses, testimony of the ATT rep, yes, there's a record of the phone calls but that's all that there were, just phone calls. Many of the calls weren't even completed. Further, Ticer testified that the phone calls could have been from anywhere in a two to three mile area; and seven, reasonable doubt.

The Petitioner agreed that the above areas were all the things that trial counsel never argued to the jury. The Petitioner agreed that trial counsel discussed Chamere Talley's testimony with him prior to trial. He said trial counsel was ineffective in failing to exclude Chamere Talley's testimony prior to trial and in failing to object that she was being called only to admit her prior statement. Finally, the Petitioner believed that the State knew what Chamere Talley was going to say and that Chamere Talley recanted her prior statement at his preliminary hearing. Post-conviction counsel read the following portion of Chamere Talley's preliminary hearing testimony:

[STATE]: Now, after the shooting at some point did you talk to the detectives of the Memphis Police Department?

[TALLEY]: Yes, ma'am.

[STATE]: Homicide Division about what you saw happened that night?

[TALLEY]: Yes, but I didn't see anything happen that night.

[STATE]: And did you talk to them on February 18th of 2013?

[TALLEY]: Yes, ma'am, I believe.

[STATE]: And at that time you spoke to the detectives, did you give them a written statement about what happened?

[TALLEY]: Yes, ma'am, but in the process of my statement, I was telling them that what I am supposed to say. Are you answering this on your own

free will? No. And kept hollering and they kept -- had me handcuffed to the chair real tight. Told me they was going to take my kids and separate my kids everywhere. I was under pressure, I was scared. Yes, ma'am, I made the statement but that statement is not true. That's why I'm here today to correct my statement.

[STATE]: And did you give them a four-page statement?

[TALLEY]: I guess they – I'm not sure how many pages it was.

[STATE]: And after you gave your-- gave the statement, did you review each page as the officers instructed you to do?

[TALLEY]: Actually, I was -- actually, no, I was reading with them.

[STATE]: Okay. So you read along with them and did you initial? Did you sign the end of the statement?

[TALLEY]: Yes, ma'am, I did.

[STATE]: Is that your signature right here?

[TALLEY]: Yes, ma'am, it is.

[STATE]: And you dated it?

[TALLEY]: Yes, ma'am. February 18th, 2013, yes, ma'am.

[STATE]: And on each of these pages you initialed -- there are some initials, CT, CT, CT.

[TALLEY]: Yes, ma'am.

[Defense counsel objects and is given a copy of statement]

[STATE]: So that is your signature and these are your initials. Is this the statement that you gave to police? Going to page 32.

[TALLEY]: Yes, ma'am. That's the statement but I felt that -- I felt I needed to come forward with the true statement because I don't want to get under pressure. Not oath, but pressure.

[STATE]: If I could finish my question. At the time that you gave officers a statement, you understood that it was very serious.

[TALLEY]: Yes, ma'am.

[STATE]: You understood that it was very important for you to tell the truth about what happened?

[TALLEY]: I kept telling them over and over I didn't know what happened. They wanted me to know what happened. They wanted -- they made me say what happened. I don't know what happened.

. . . .

[STATE]: Now, when the officers interviewed -- officers interviewed you and you gave this statement, do you recall them asking you to do you know who is responsible for the death of Joe Howell?

[TALLEY]: Yes, ma'am. And I told them I don't know. I didn't know. I was telling their -- hearsay. I don't know. And

[STATE]: And do you recall telling them yes, I think it was a guy named Bean?

[TALLEY]: I said no. They were saying it was a guy named Bean. I never identified the shooter. How can I identify a shooter that I didn't see?

[STATE]: Do you also recall the officers asking how you are aware of this?

[TALLEY]: No, ma'am.

[STATE]: Would you like an opportunity to review your statement?

[TALLEY]: I don't need to review it. I said what they wanted me to say. I said what –

[STATE]: So after reviewing the statement, do you recall the officers asking you -- asking you how you -- how you are aware of this?

[TALLEY]: I don't recall him saying how I was made aware of this.

- 13 -

[STATE]: Well, do you recall giving this answer: I saw him running after shots were fired, him and another person? I don't know. They were the only people I saw outside running from the direction of the truck as it was rolling away.

[TALLEY]: Yes, ma'am. under pressure. Like, I over and over, they kept calling me, telling me I But that -- I was kept telling them calling me liars. was lying. They was going to go take my kids and call for a transport car to go get my kids from my house. I was under pressure. I wasn't under oath but I was under pressure.

[JUDGE]: What were they accusing you of lying about?

[TALLEY]: Lying about knowing what happened.

[JUDGE]: You mean you had a statement, then they said that your statement was a lie?

[TALLEY]: No, sir. They came and got me one time before and they -- they

[JUDGE]: I'm talking about this particular occasion. You said they kept calling you and you said that you were lying.

[TALLEY]: Yes, sir. They kept –

[JUDGE]: What did they say -- what did they say you were lying about?

[TALLEY]: Not knowing what was going on.

[JUDGE]: So you had told them at the scene that you didn't see what happened?

[TALLEY]: I didn't see them at the scene. I saw them at the --when they took -- brought me down here.

[JUDGE]: Down here, downtown to make a statement?

[TALLEY]: Yes, sir.

[JUDGE]: So downtown you gave a statement? You told these officers that took the statement you didn't see what?

[TALLEY]: Over and over. I didn't know what happened. You are lying. You're lying. You know what? F it F it I'm just going to take -- go get your kids, your three kids.

[JUDGE]: You said F? What are you going -- what are you saying?

[TALLEY]: He said f**k it, f**k it, I'm just going to go get your three kids. He said how old are they? I was like 14, 9, and 3. You know what, he was like, I'm fixing to call the DCS and I'm just going to go get them to transport your kids and have them separated everywhere.

[JUDGE]: Okay. And so following all of that, is that when you started to –

[TALLEY]: That's when I –

[JUDGE]: Signed the statements that-- signed the statements here that you –

[TALLEY]: Yes, sir. But in between I asked if I can have a attorney because I didn't know my rights. What do you need an attorney for? You're not being charged.

Based on the above exchange, the Petitioner claimed that trial counsel should have objected to Chamere Talley being called as a witness because trial counsel knew that the State was calling Chamere Talley for the sole purpose of admitting her statement. The Petitioner also alleged that trial counsel should have objected when the statement was admitted as substantive evidence, and not simply to impeach Chamere Talley. Post-conviction counsel then read the following excerpt into the record:

Q: That's fine. We won't use the map. So were you aware of the death of your sister's boyfriend Joe Howell, correct?

A: Yes, sir.

Q: Do you know who was responsible for that death?

A: No, sir.

Q: Did you see anyone around the night that occurred?

A: No, sir.

Q: Did you tell the police that you did?

A: Yes, sir.

Q: What happened that lead [to] you telling the police you knew who was responsible?

A: They came and got me from my job and I was -- I was handcuffed. They handcuffed me to the table maybe for three or four hours and I kept saying I don't know. They kept calling, you're a f**king liar. You're a f**king liar. We know how much you care for you kids. We found out that you got three kids that you love so much.        You know what we're going to do. We going to take all three of your kids and we're going to separate them.  And then they filled out a first-degree murder paper and took my thumbprint like I was charged with murder.

Q: Okay. Well, they did read your rights, correct?

A: No, sir, I was not read my rights.

On cross-examination, the Petitioner agreed that following his arrest, he told an investigator that he was at his girlfriend's house in East Memphis; however, his cell phone records later revealed that was not where he was.  He said the police recovered and retained three cell phones from him, and he only used one of them.  He affirmed that he told trial counsel about this, but that trial counsel did not do anything with this information.  He did not provide trial counsel with the phone numbers for the other phones.  He denied that his preliminary hearing attorney told him that he represented the potential third party suspect.

Trial counsel testified that he was retained by the Petitioner to represent him in this case.  He utilized the same investigator as the Petitioner's co-defendant, and he received additional funding to locate Chamere and Dominique Talley when they were determined not to be found.  Trial counsel did not recall the Petitioner telling him that he had three telephones until they started "getting into the State's proof with their expert witness." Although trial counsel was aware that the Petitioner had multiple phones, he said the problem was the State was attempting to show a conspiracy between the Petitioner, his codefendant, Chamere Talley, and Dominique Talley.  The State did not have the proof they needed after Chamere Talley recanted her statement at the preliminary hearing. However, they subsequently obtained all the phone records for all four individuals.  The

State utilized those phone records to show not only the Petitioner's location at the time of the offense but also actual telephone conversations between all four of the individuals immediately before and after the shooting. The phone records also established that all four individuals had been talking to one another, the duration of the phone calls, the frequency of the phone calls, and the geographic location. The phone records specifically established that the Petitioner's phone was near the Pendleton Place Apartments, where the victim was killed. Finally, trial counsel recalled that there was a Crime Stoppers tip which alleged that all four individuals had gotten together to set up the deceased victim.

Asked if he had reviewed the preliminary hearing transcript prior to trial, trial counsel said, "I probably did, yes. But I just knew that she recanted her statement." Trial counsel told the Petitioner that he was concerned about Chamere Talley's statement, but the Petitioner did not seem to be worried about it and told trial counsel, "don't worry about her." Regarding closing argument, trial counsel said that he was "cut off probably after about 80 percent" of his argument and that he believed he was unable to give "100% of his closing argument to the jurors." He said codefendant's counsel and the State argued the same amount of time.

Including Chamere Talley's statement, trial counsel agreed that the case was based on circumstantial evidence. Although the phone records placed the Petitioner at the crime scene and Mr. Edwards and Ms. Jennings put the Petitioner at the crime scene "looking like he's up to no good with a gun," trial counsel agreed that none of this evidence directly showed that the Petitioner killed the victim. Trial counsel agreed that Chamere Talley's statement that she saw the Petitioner running from the scene of the victim's truck was "crucial" and "devastating" to the Petitioner's case.

Asked if it was no surprise that Chamere Talley came to trial and testified that she did not see the Petitioner running from the scene and that she did not see the Petitioner at all, trial counsel stated,

> I don't know if that's a fair question as far as the term 'surprise'. We do know what she gave in her written statement to the police, we do know she recanted it. But then she took off and then she did not want to be giving any testimony and I wasn't sure why she didn't want to give any testimony.

Trial counsel agreed that he was aware that Chamere Talley recanted her statement prior to the Petitioner's trial and that he included her recantation in a pretrial motion to dismiss. He agreed that the State did not object to the inclusion of this statement that she had "totally recanted her statement" because "the police threatened her by handcuffing her and advising they were going to contact DHS to take her children away from her." He agreed that Chamere Talley was "not back on board with the State" after she was declared a material

witness, arrested, and released with the understanding that she would show up for court. He agreed this was a "clear indicator" that she was "not playing ball with the State[.]" Trial counsel attempted to contact her as well. He did not consider filing a motion in limine to exclude her testimony, even though he was concerned about it.

Rule 607, Tennessee Rules of Evidence, provides that "[t]he credibility of a witness may be attacked by any party, including the party calling the witness." The Advisory Commission Comment to Rule 607 states, "Decisional law prohibits a lawyer from calling a witness-knowing the testimony will be adverse to the lawyer's position-solely to impeach that witness by an inconsistent statement." Asked if he had reviewed Rule 607 prior to the Petitioner's trial, trial counsel said he was familiar with the rule and focused on the "solely" aspect of it. Trial counsel said he knew at the time that the State was attempting to show this was a conspiracy and that Chamere Talley was one of the unindicted co-conspirators. Trial counsel believed, if nothing else, the State could have potentially argued that they were calling Chamere Talley to talk about these telephone calls before and after, her telephone number, and any discussions she had with the Petitioner. Trial counsel did not file a pretrial motion to exclude Chamere Talley's testimony because he believed the State would have been able to call her as a witness to testify regarding the above grounds. He did not object "that she was called only to get to that statement, and that's hearsay" because he did not believe that was the only reason the State would have called her as a witness. Trial counsel was not shocked or surprised that Chamere Talley recanted her statement.

Trial counsel acknowledged that after Chamere Talley testified and her statement was admitted to impeach her at trial, the State moved the statement into evidence as substantive evidence under Rule 803(26). Asked if he had reviewed Rule 803(26) prior to trial, trial counsel explained, "I understood that I should've asked for a hearing, I should've objected." Trial counsel agreed that the trial court asked if he objected to the statement and whether he wanted a hearing, and trial counsel said he had no objection at trial. He agreed that co-counsel did not object because the statement read that the man running with the Petitioner had dreadlocks and the codefendant did not have dreadlocks at that time. Trial counsel agreed that had he objected, he would have had a compelling argument that the statement provided by Chamere Talley was not given under trustworthy circumstances. Trial counsel explained,

> And I believe and -- and -- that was an error. In hindsight, I wish I would've asked to have that hearing. The State was of the position that, like I said, she was -- she was involved in this somehow and that's why she was handcuffed and she got treated like no different than any other defendant, and while I'm pretty sure I know how Judge Coffee would've ruled, I should've asked for that hearing just to make the record and I did not.

Asked if the case would have survived a motion for judgment of acquittal without Chamere Talley's statement, trial counsel said, "I don't think the Court would have granted a judgment of acquittal." He agreed that the trial court told him that it did not think the statement hurt the defense.

On cross-examination, trial counsel agreed that Detective Frias testified immediately after Chamere Talley's testimony and provided the circumstances under which the statement was given. He agreed that this testimony would have been the same testimony the State would have presented had trial counsel asked for a hearing. Although he agreed that the trial court made clear what its ruling would have been based on the motion for new trial hearing, trial counsel believed he did not create a sufficient record. Nevertheless, trial counsel agreed that the jury heard the testimony about the preliminary hearing, the recantation, and the circumstances of the recantation and convicted the Petitioner.

Trial counsel reaffirmed that the State did not call Chamere Talley to testify for the sole purpose of her identification of the Petitioner, and there were other reasons she was needed to testify. He agreed Chamere Talley did not recant the timeline of events or the relationship of the parties. He affirmed that at preliminary hearing she did not identify the Petitioner by his nickname, but at trial identified him as "Bean," and she said he had on a red skull cap, black pants, and black tennis shoes. He affirmed that this was the same description provided by the other witnesses. Trial counsel agreed that the phone records corroborated that this was a conspiracy between the four individuals. Trial counsel agreed that after the case was dismissed at the preliminary hearing and the Petitioner indicted by the grand jury, Chamere Talley was unable to be found. Trial counsel was concerned, given the State's conspiracy theory, that Chamere Talley may have had a "change of heart" and came in and testified consistently with her original statement. He agreed that neither the State nor the defense had spoken with her. Although trial counsel believed he "had a legal basis to fight that statement[,]" the statement "was going to come in . . . [and he] did not have a legal basis to object to her taking the stand and testifying[.]"

Trial counsel stated that he should have filed a motion to exclude her statement as substantive evidence; however, "[a]t the time, [he] was focused more solely on relaying to the jury the facts and circumstances regarding her statement. Trial counsel explained,

> The State . . . would have argued to -- in this hearing that she was being treated as a suspect. I regret not creating a record and I do believe that was an error. But I knew that the jury was going to hear that statement one way or the other and I did not think the jury was -- would be able to distinguish between substantive evidence and impeachment evidence. They're just going to – they're going to know that she said that prior so I

- 19 -

focused solely on that and I don't -- in hindsight, I would have done it different.

Trial counsel regretted not filing a motion for a Rule 803(26) hearing to determine whether the statement would be admissible as substantive evidence; however, he agreed that even if he had filed such a motion, it would not have been successful based on the ruling of the trial court at the motion for new trial hearing and the statements made during the State's motion to admit the statement.

On redirect examination, trial counsel agreed that Chamere Talley was shackled and handcuffed during her statement to police. He agreed that obscenities were screamed at her and that she was told she could be locked up for murder and her children taken away. Based on these circumstances, trial counsel would have argued that she was frightened that these things would happen if she did not give the statement as directed. On recross examination, trial counsel agreed that the jury was presented with all of this information.

One of the assistant district attorneys who prosecuted the Petitioner and participated in the Petitioner's trial testified at the hearing. The prosecutor disagreed that the case was "entirely circumstantial"; however, he acknowledged that there were no eyewitnesses who saw "the two people fire the shots" that killed the victim. The prosecutor agreed that Chamere Talley's statement was "important" to the case, but the State would have had a case without it. The prosecutor was aware of Chamere Talley's preliminary hearing statement, and he did not speak with her prior to the Petitioner's trial. He explained, "I would call her to the stand without talking to her because I didn't know what she was going to say[.]" He did not recall whether trial counsel filed a motion to dismiss based on Chamere Talley's recanted statement. After review of court records, he agreed that a material witness warrant for failure to cooperate with the State was issued for Chamere Talley on March 25, 2015. Despite his knowledge of the preliminary hearing, trial counsel's motion to dismiss, and the material witness warrant for failure to cooperate, the prosecutor was not surprised Chamere Talley "took a position similar to" the preliminary hearing. However, he said Chamere Talley did not say she "knew nothing[.]" The prosecutor was "not surprised her testimony ended up being consistent with one of the two things that she had said."

Asked if it was a fair statement that he was on notice that Chamere Talley would recant her statement, the prosecutor said, "In part, yes." The prosecutor was familiar with Rule 803(26) prior to the Petitioner's trial. The prosecutor agreed that following Chamere Talley's testimony regarding what she observed on the night of the offense, he asked her about her prior statement to police. He affirmed that ChamereTalley told the jury that she had been handcuffed and shackled, and she claimed that Detective Frias had threatened to

charge her with murder and take her children away. He affirmed that Chamere Talley denied her prior statement was true.

The prosecutor agreed that he impeached Chamere Talley's credibility under Rule 613 and then moved to admit the statement [that said she went to the door when she heard the shooting, looked out the door, and saw the Petitioner running down the street or running away from the scene of the rolling truck] as substantive evidence under Rule 803(26). He agreed that Chamere Talley said she had been dating the Petitioner for a couple of months in her statement, but she denied dating the Petitioner at trial. The prosecutor recalled that Chamere Talley testified that Detective Frias threatened to take away her kids during her statement. The prosecutor recalled Detective Frias testifying in response that "I don't threaten to take away people's kids but I said you look like you might be involved in this murder and . . . if you get arrested for murder, what's going to happen to your kids?"

On cross-examination, the prosecutor affirmed that Chamere Talley testified in the Petitioner's trial under a material witness warrant. Based on his experience, when witnesses are brought in under these circumstances, they are not likely to speak with the State. Accordingly, the prosecutor did not attempt to speak with Chamere Talley prior to trial. The prosecutor recalled attempting to speak with her sister, Dominique Talley, and she understood she had to be in court, but she too declined to speak with him. He further explained that Chamere Talley may not have cooperated because she believed she could have been charged in the instant case based on what Detective Frias advised her. He agreed that most of her testimony at trial involved minimizing her relationship to, participation and involvement with, and contact with the Petitioner. He characterized Chamere Talley's preliminary hearing testimony as she "simply shut down and wasn't going to provide any information." He opined that through this entire case Chamere Talley may have been paid or scared because she thought she was merely setting the victim up to be robbed and did not know they were going to kill him. He said the Talley sisters' involvement was that they knew the victim had come into some money, had bought a new car, and was going to sell some pills at that apartment complex. The State's theory at trial was that the sisters found out that the victim had money, got word to the Petitioner and his codefendant where he was going to be, and then the victim was robbed and killed.

He agreed that Chamere Talley's trial testimony differed from her preliminary hearing testimony. At the preliminary hearing, she said she did not know the Petitioner and did not know why the police were questioning her. At trial, she admitted to at least some sort of relation or connection with him. He reasoned that she did so because at the preliminary hearing, the State had not yet obtained the phone records confirming "a clear connection" between Chamere Talley and the Petitioner. At trial, the prosecutor went over Chamere Talley's statement with her "line-by-line." During her testimony, Chamere Talley did not disavow her entire statement and confirmed her name, her sister's name,

where they lived, that her sister was dating the victim, that the Petitioner's nickname was "Bean," the location of everyone in the apartment complex, the timeline of events, and the description of what the Petitioner was wearing (which was consistent with what the other witnesses had described). She confirmed that she was at home when her sister arrived, the timing of the shooting between when her sister arrived there, the victim being there. The prosecutor agreed that there were two statements that were different in Chamere Talley's statement: (1) that she looked out immediately after the shooting and (2) that she saw the Petitioner and his codefendant running from the scene.

The prosecutor agreed that had there been a Rule 803(26) hearing outside the presence of the jury, Detective Frias would have testified the same way he did at trial. The prosecutor also stated the reason they did not have such a hearing was because "all the parties knew the statement and the preliminary testimony were going to come in." Had trial counsel objected on this ground, the codefendant's attorneys would have gotten the statement in themselves because of the description Chamere Talley had given of the codefendant wearing dreads, which was contrary to other testimony that the codefendant did not have dreads at the time of the offense. He said everyone wanted the statement in evidence for different reasons: trial counsel wanted it in for impeachment purposes to bolster Chamere Talley's statement that she did not look out and see the Petitioner running from the scene which was consistent with her preliminary hearing testimony and codefendant's counsel wanted it in because it was exculpatory.

On redirect examination, the prosecutor agreed that the Talley sisters were not charged as coconspirators in the instant case. He also believed that the State's theory that the Talley sisters were involved was presented to the jury. He clarified that Chamere Talley testified at trial that she had never dated the Petitioner and denied that the statement to Detective Frias stating otherwise was true. He clarified based on page 875 of trial transcript that Chamere Talley denied giving a description of the Petitioner's clothing because she did not see him on the day of the offense. He also clarified based on the transcript that she recanted the description of the Petitioner. On recross examination, the prosecutor agreed that he went "back and forth" with Chamere Talley during her trial testimony regarding the description of the Petitioner and whether she knew the Petitioner as Bing or Bean.

Appellate counsel for the Petitioner testified at the hearing and explained that she did not raise the issue involving Chamere Talley being called for the purpose of impeachment in the Petitioner's direct appeal. In preparing the Petitioner's direct appeal, appellate counsel reviewed the testimony of Chamere Talley. Appellate counsel did not believe "the issue" regarding Chamere Talley's testimony was "the strongest argument" for her to raise on appeal. Appellate counsel stated she did not believe she could demonstrate "that that was the sole reason that she was called to testify." Based on caselaw that developed after the Petitioner's appeal, appellate counsel now believed this issue may

have had merit. Appellate counsel cited State v. Gilbert, No. M2020-01241-CCA-R3-CD, 2021 WL 5755018 (Tenn. Crim. App. Dec. 3, 2021) as support, but she acknowledged that this case had since been designated not for citation. Appellate counsel agreed that she did not have a legal basis to raise the Chamere Talley issue on appeal. Appellate counsel believed, upon reading the transcript, that Chamere Talley's testimony was beneficial to the Petitioner. Appellate counsel believed that Chamere Talley was "not credible in her testimony about what happened that night."

The post-conviction court denied relief by written order, and the Petitioner now appeals.

## **ANALYSIS**

The following well-established law governs the Petitioner's ineffective assistance of counsel claims. Post-conviction relief is only warranted when a petitioner establishes that his or her conviction or sentence is void or voidable because of an abridgement of a constitutional right. Tenn. Code Ann. § 40-30-103. A post-conviction petitioner has the burden of proving the factual allegations by clear and convincing evidence. Id. § 40-30-110(f); see Tenn. Sup. Ct. R. 28, § 8(D)(1); Nesbit v. State, 452 S.W.3d 779, 786 (Tenn. 2014). Evidence is considered clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from it. Lane v. State, 316 S.W.3d 555, 562 (Tenn. 2010); Grindstaff v. State, 297 S.W.3d 208, 216 (Tenn. 2009); Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998).

A claim for post-conviction relief based on alleged ineffective assistance of counsel presents a mixed question of law and fact. Mobley v. State, 397 S.W.3d 70, 80 (Tenn. 2013) (citing Calvert v. State, 342 S.W.3d 477, 485 (Tenn. 2011)). This court reviews "a post-conviction court's conclusions of law, decisions involving mixed questions of law and fact, and its application of law to its factual findings de novo without a presumption of correctness." Whitehead v. State, 402 S.W.3d 615, 621 (Tenn. 2013) (citing Felts v. State, 354 S.W.3d 266, 276 (Tenn. 2011); Calvert, 342 S.W.3d at 485). However, a post-conviction court's findings of fact are conclusive on appeal unless the evidence in the record preponderates against them. Calvert, 342 S.W.3d at 485 (citing Grindstaff, 297 S.W.3d at 216; State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999)). "Accordingly, appellate courts are not free to re-weigh or re-evaluate the evidence, nor are they free to substitute their own inferences for those drawn by the post-conviction court." Whitehead, 402 S.W.3d at 621 (citing State v. Honeycutt, 54 S.W.3d 762, 766 (Tenn. 2001)). "As a general matter, appellate courts must defer to a post-conviction court's findings with regard to witness credibility, the weight and value of witness testimony, and the resolution of factual issues presented by the evidence." Id. (citing Momon v. State, 18 S.W.3d 152, 156 (Tenn. 1999)).

- 23 -

To prevail on an ineffective assistance of counsel claim, the petitioner must establish that (1) his lawyer's performance was deficient and (2) the deficient performance prejudiced the defense. Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996); Strickland v. Washington, 466 U.S. 668, 687 (1984). "[A] failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component." Id. at 370 (citing Strickland, 466 U.S. at 697).

A petitioner successfully demonstrates deficient performance when the petitioner establishes that his attorney's conduct fell below "an objective standard of reasonableness under prevailing professional norms." Id. at 369 (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). Prejudice arising therefrom is demonstrated once the petitioner establishes "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Id. at 370 (quoting Strickland, 466 U.S. at 694).

In assessing an attorney's performance, we "must be highly deferential and should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Burns, 6 S.W.3d at 462 (citing Strickland, 466 U.S. at 689). In addition, we must avoid the "distorting effects of hindsight" and must "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." Strickland, 466 U.S. 689-90. "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." Id. at 688-89. However, "'deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation.'" House v. State, 44 S.W.3d 508, 515 (Tenn. 2001) (quoting Goad, 938 S.W.2d at 369).

A defendant has a right to effective representation both at trial and on direct appeal. Campbell v. State, 904 S.W.2d 594, 596 (Tenn. 1995) (citing Evitts v. Lucey, 469 U.S. 387 (1985)). The test for ineffective assistance of counsel is the same for both trial and appellate counsel as the Strickland standard set forth above. That is, a petitioner alleging ineffective assistance of appellate counsel must prove both that appellate counsel was deficient in failing to adequately pursue or preserve a particular issue on appeal and that, absent counsel's deficient performance, there was a reasonable probability that the issue "would have affected the result of the appeal." Id. at 597; see also Carpenter v. State, 126 S.W.3d 879, 886-88 (Tenn. 2004).

- 24 -

**I. Rule 803(26).**  The Petitioner asserts that the "post-conviction court erroneously determined that trial counsel was not prejudicially ineffective for failing to object to Chamere Talley's prior statement violating Rule 803(26)'s mandate for a trustworthiness hearing and the common law prohibition from State v. Mays and State v. Gilbert."  The Petitioner also asserts appellate counsel was ineffective in failing to raise this issue in his direct appeal.  In response, the State contends the post-conviction court properly denied relief.  We agree with the State.

*Trial Counsel.*  In denying the Petitioner's claim regarding trial counsel, the post-conviction court provided an extensive analysis of the testimony from the evidentiary hearing, the applicable law, and rested its determination on the following:

> Regardless of whether there was evidence to show the prosecutor called Ms. Talley as a witness solely to place her prior statement before the jury, this Court credits trial counsel's testimony that he made a strategic decision not to object to her testimony or the admission of her statement.  At the post-conviction hearing, counsel testified he was aware of Rule 607 and decisional law regarding the rule.  He explained why an objection under Rule 607 was not warranted.  He said his strategy was to show the jury the coercive circumstances under which Ms. Talley's statement was produced.  Counsel, after speaking with the Petitioner, decided not to object to the admission of Ms. Talley's statement as substantive evidence.  This Court finds counsel's decision was based upon adequate investigation of the law and facts.  The Petitioner did not introduce evidence showing this was an unreasonable strategic decision.  Trial counsel testified that the trial judge would have overruled any objection.  Nevertheless, in hindsight, counsel believed he should have objected and made a record of the issue for appellate purposes.  However, the Petitioner is not entitled to the benefit of hindsight to challenge informed strategic decisions made by trial counsel, even if they resulted in an undesired outcome.  See Goad, 938 S.W.2d at 369 ("The fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation."); Adkins v. State, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994).

> Accordingly, this Court finds the Petitioner has not shown, by clear and convincing evidence, that counsel's performance was deficient.

In this section of his brief, the Petitioner asserts that the evidence preponderates against the post-conviction court's determination because trial counsel's decision not to

challenge Chamere Talley's statement under Rule 803(26) was neither informed nor reasonable under prevailing professional norms. The Petitioner insists that trial counsel's decision was not a reasonable strategic choice. We disagree.

At the evidentiary hearing, trial counsel testified that he had reviewed Chamere Talley's written statement and preliminary hearing testimony before the trial. He discussed his concerns about Chamere Talley with the Petitioner. While he believed that Chamere Talley's identification of the Petitioner running from the scene was "crucial" to the State's case, he did not believe he had a legal basis to object to her testifying at trial. Moreover, trial counsel testified that he was familiar with Rule 607; however, he wanted Chamere Talley's statement to be admitted to show the coercive tactics employed by the Memphis Police Department. Trial counsel focused on the "solely" aspect of Rule 607 and believed the State could have potentially argued that they were calling Chamere Talley to talk about telephone calls before and after the offense, her telephone number, and any discussions she had with the Petitioner.

With respect to Rule 803(26), trial counsel testified that he had reviewed Rule 803(26) prior to trial and regretted not asking for a hearing or objecting to the admissibility of the statement. However, trial counsel agreed that the trial court asked if he objected to the statement and whether he wanted a hearing, and trial counsel said he had no objection at trial. Trial counsel acknowledged that the trial court discussed the Rule 803(36) procedures with the parties and that trial counsel reviewed the statement and the law with the Petitioner. After their discussion, trial counsel notified the trial court that he did not have any objection to its admission as substantive evidence, and he did not request a jury-out hearing. Trial counsel explained that he sought to use to the statement and the circumstances around it to the benefit of the Petitioner's defense. Regardless, trial counsel also believed the statement would be introduced by the co-defendant because it was exculpatory in that Chamere Talley described one of the perpetrators as having dreadlocks and the co-defendant did not have that hairstyle at the time of the offense. Under these circumstances, we agree with the post-conviction court and conclude that trial counsel made a strategic choice not to object to the admissibility of the statement. Accordingly, the Petitioner has failed to establish deficient performance.

Even assuming that trial counsel was deficient in failing to object to the admissibility of the statement and to request a hearing, the record shows the statement would not have been excluded by the trial court. At the evidentiary hearing, trial counsel agreed that Detective Frias testified immediately after Chamere Talley's testimony and provided the circumstances under which the statement was given. Trial counsel agreed that this testimony would have been the same testimony the State would have presented had trial counsel asked for a hearing. Trial counsel agreed that the trial court made clear what its ruling would have been based on the motion for new trial hearing when it

determined that the statement was given under trustworthy circumstances. Trial counsel agreed that the jury heard the testimony about the preliminary hearing, the recantation, and the circumstances of the recantation and convicted the Petitioner. At the motion for new trial, the trial court engaged in an extensive analysis of this issue and noted that the statement was properly admitted because it was given under trustworthy circumstances and based on the parties' collective desire to do so. Accordingly, the Petitioner has failed to establish that but for trial counsel's unprofessional error, the result of the proceeding would have been different. He is not entitled to relief.

*Appellate Counsel.* In denying relief based on appellate counsel's failure to raise this issue on appeal, the post-conviction court determined as follows:

> This Court credits the testimony of the Petitioner's appellate counsel and finds she made a strategic decision not to raise any issues related to Ms. Talley's testimony or prior statement. At the post-conviction hearing, appellate counsel testified that, after she reviewed the trial record, she considered but decided against including those issues on appeal. She said there was no strong argument to be made because she could not demonstrate the prosecution called Ms. Talley as a witness solely for impeachment purposes. According to appellate counsel, there were stronger issues, such as the Brady claim about the alternate suspect.
>
> This Court finds appellate counsel's decision to raise only the issues she felt were the strongest was not deficient. Given the trial judge's determinations that Ms. Talley's prior statement was given under trustworthy circumstances, her claims of coercion were not credible, and her statement was admissible under the rules, the omitted issues were not so meritorious that it was unreasonable for her not to include it in the appeal. The Petitioner has failed to establish by clear and convincing evidence that appellate counsel's performance was deficient.
>
> This Court also finds, assuming arguendo counsel should have raised such issues on appeal, the Petitioner was not prejudiced by counsel's failure to do so. Extensive factual findings supported the trial judge's evidentiary rulings, and he determined Ms. Talley's testimony was not credible. Notably, the trial judge found the Petitioner's defense was not harmed by the admission of Ms. Talley's testimony or her prior statement. The Petitioner has not shown how the record preponderates against these findings. Thus, the factual findings and credibility determinations would have been "binding" on the appellate court. State v. Jones, 568 S.W.3d 101, 128 (Tenn. 2019) (quoting Kendrick v. State, 454 S.W.3d 450, 479 (Tenn. 2015)).'

Accordingly, the Petitioner has not demonstrated a reasonable probability that the appeal would have been successful if appellate counsel challenged the admission of Ms. Talley's testimony or prior statement.

The record fully supports the determination of the post-conviction court. The Petitioner has failed to establish that appellate counsel's decision was unreasonable or deficient. Moreover, even if appellate counsel's decision not to pursue this issue in the direct appeal was deficient, the Petitioner has failed to establish that, absent appellate counsel's deficient performance, there was a reasonable probability that the issue "would have affected the result of the appeal." Campbell v. State, 904 S.W.2d 594, 597 (Tenn. 1995); Carpenter, 126 S.W.3d at 888. In subsection IA, we determined that the Petitioner failed to establish deficient performance or prejudice stemming therefrom based on trial counsel's failure to object to, move to exclude, or move for a hearing pursuant to Rule 803(26). We further concluded that the Petitioner was not prejudiced based on this ground because the jury heard the circumstances under which the recantation was given and convicted the Petitioner. In addition, at the motion for new trial, the trial court determined that her statement was given under trustworthy circumstances and expressed how it would have rejected this issue based on the parties' collective desire for the statement to be admitted. For the same reasons, we conclude the record supports the post-conviction court's determination that the Petitioner has failed to establish that appellate counsel was deficient or that the Petitioner suffered any prejudice from this alleged deficiency. He is not entitled to relief.

**II. Due Process Claim.** The Petitioner contends "the post-conviction court erred when it determined that the State and the trial court did not fundamentally deprive [the Petitioner] of due process where (1) the State intentionally called a witness primarily for the purpose of impeaching her; and (2) the trial court failed to conduct Rule 803(26)'s mandatory trustworthiness hearing, resulting in the only direct evidence against [the Petitioner] without adequate safeguards." In other words, the Petitioner presents a standalone due process claim based on the trial court's failure to comply with Rule 803(26). In response, the State contends, and we agree, that the Petitioner has waived this claim by not objecting to it at trial, by failing to raise it on direct appeal, and by failing to include it as a ground in his petition seeking post-conviction relief. A ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented with certain exceptions not applicable here. Tenn. Code Ann. § 40-30-106(g); Mobley v. State, 397 S.W.3d 70, 104 (Tenn. 2013). The record confirms that the Petitioner did not object to the use of Chamere Talley's testimony and the admission of her statement at trial. He also did not raise this issue at trial or on direct appeal. Finally, the Petitioner

did not include this issue in his petition for post-conviction relief; thus, the post-conviction court did not rule upon it. For all these reasons, this issue is waived.

III. **Closing Argument.** Next, the Petitioner contends "the post-conviction court erred when it determined that [trial counsel] provided a competent closing argument." In response, the State contends the post-conviction court properly determined that trial counsel provided an adequate closing argument. The record shows that in his direct appeal, this Court rejected the Petitioner's claim that the trial court erred by unreasonably limiting trial counsel's closing argument, which prevented trial counsel from covering the portions of his argument dealing with jury instructions, admissions against interest, identity, and burden of proof. In rejecting this claim, this Court noted that at the motion for new trial, the trial court observed that, according to its notes, the State's closing argument for both defendants, including rebuttal argument, took approximately fifty minutes, the co-defendant's closing argument took fifty minutes, and the Petitioner's argument had gone on for an hour at the time that the trial court instructed counsel to start wrapping it up. The court also observed for the record that, at the conclusion of the trial, one of the jurors made the "gratuitous statement" that the arguments were too long and that the jurors did not know how much longer they "could have actually sat there," had the court not stepped in to instruct counsel to start wrapping up his argument." Bell, 2017 WL 1907739, at *12.

In denying this issue, the post-conviction court determined

This Court finds the hearing testimony was consistent with the appellate court's findings that the closing argument from the Petitioner's trial counsel was rambling and lengthy. However, counsel testified the only part of his argument he did not deliver after the trial judge instructed him to "wrap it up" was his remarks on the jury instructions. The Petitioner has not explained or proven how the absence of counsel's remarks constituted deficient performance or how it resulted in prejudice. Because juries are presumed to follow a trial court's instructions, State v. Clark, 452 S.W.3d 268, 293 (Tenn. 2014) (citing State v. Parker, 350 S.W.3d 883, 897 (Tenn. 2011)), and no evidence was presented to overcome this presumption, this Court cannot find any prejudice resulted from trial counsel's closing argument.

The record fully supports the determination of the post-conviction court. In his brief, the Petitioner claims that trial counsel failed to piece together a timeline of events based on witnesses' testimonies, failed to point out the discrepancy between Mr. Edwards's testimony and the State's uncontroverted, stipulated timing of the 9-1-1 call, and instead made lengthy movie analogies and redundant arguments. We have reviewed the transcript of trial counsel's closing argument. Trial counsel repeatedly attacked the credibility of

Chamere Talley and the tactics used by the Memphis Police Department in obtaining the statement. Trial counsel invoked one movie analogy, The Godfather, to compare when the character Don Corleone had a henchman hold a gun to his agent's head to force the agent to sign a release with the actions of Detective Frias in forcing Chamere Talley to make and sign her statement. Trial counsel's closing argument, which consisted of 28 pages of transcript, continued to challenge the voluntary nature of Chamere Talley's statement and the tactics of MPD. Trial counsel also discussed the testimonies of the other witnesses, the inconsistencies in their testimony, and the timeline of events. On page 29, the trial court interrupted trial counsel, noted that he had been arguing for an hour, and asked him to start wrapping up. Trial counsel advised the court that he would move on to the jury instructions. On the following page, the trial court again cautioned trial counsel to conclude his argument because he began to repeat himself. At the evidentiary hearing, trial counsel said that he was "cut off probably after about 80 percent" of his argument and he believed he was unable to give "100% of his closing argument to the jurors." As noted by the post-conviction court, the trial court provided the jury with the instructions, which they were presumed to follow. The Petitioner has failed to establish by clear and convincing evidence that trial counsel was deficient in his closing argument. Accordingly, he is not entitled to relief.

IV. **Cumulative Error.** Finally, the Petitioner contends "the post-conviction court, based on the evidence presented at the hearing on the petition for relief, failed to properly evaluate the cumulative impact of trial counsel's multiple prejudicial errors on the evidence as a whole." A literal reading of the Petitioner's claim implies that the post-conviction court was requested to review the alleged errors in the aggregate to determine their impact on the Petitioner's case. However, the record shows that this issue was not presented to or ruled upon by the post-conviction court; thus, it is waived. See Tenn. Code Ann. § 40-30-110(c) ("Proof upon the petitioner's claim or claims for relief shall be limited to evidence of the allegations of fact in the petition."); Tenn. Sup. Ct. R. 28, § 8(D)(4) ("The hearing shall be limited to issues raised in the petition."); see also Holland v. State, 610 S.W.3d 450, 458 (Tenn. 2020). Moreover, to the extent that the Petitioner's claim is based on the cumulative error doctrine, we note that the cumulative error doctrine recognizes that "there may be multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." State v. Hester, 324 S.W.3d 1, 76 (Tenn. 2010); see also State v. Taylor, 968 S.W.2d 900, 912 (Tenn. Crim. App. 1997) (applying cumulative error doctrine in the post-conviction context). When determining whether to apply this doctrine, a reviewing court must consider the nature and number of the errors, their interrelationship, any remedial measures taken by the trial court, and the strength of the State's case. Hester, 324 S.W.3d at *77 (quoting United States v. Sepulveda, 15 F.3d 1161, 1196 (1st Cir. 1993)). Because

the Petitioner has failed to establish a single error in this case, he is not entitled to cumulative error relief.

## CONCLUSION

We affirm the judgment of the post-conviction court.

s/ **Camille R. McMullen**
CAMILLE R. MCMULLEN, JUDGE